CLERK'S OFFICE
A TRUE COPY
Feb 17, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |  |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| | ) | Case No. | 26-MJ-35 |
| | ) | | |
| | ) | | |
| | ) | | |
| _____ | ) | | |
| *Defendant(s)* | | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____ in the

_____ District of _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| | |

This criminal complaint is based on these facts:

❏ Continued on the attached sheet.

*James Buck*
_____
*Complainant's signature*

_____
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date:   02/17/2026
_____

*William E. Duffin*
_____
*Judge's signature*

City and state: _____
_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT and SEARCH WARRANT**

I, James Buck, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant is a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  Your Affiant has been a Special Agent with the FBI since June, 2023 and is assigned to the FBI's Milwaukee Area Safe Streets Task Force (MASSTF), a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including narcotics trafficking and conspiracy to possess narcotics with intent to distribute, as defined under Title 21 of the United States Code.   Your Affiant has been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. Your Affiant has participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects.  As a result of this training and investigative experience, your Affiant has learned how and why narcotics traffickers typically conduct various aspects of their criminal activities.   Your Affiant has experience in the investigation of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.  Through your Affiant's training, education, and experience, your Affiant became familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.  In addition, your Affiant has conducted follow-up investigations concerning the concealment of assets, money, and bank records, and the identification of co-conspirators through

the use of ledgers, telephone bills and records, photographs, and bank checks, all as related to drug trafficking.

2.      Your Affiant has participated in investigations involving the interception of communications made via wire and electronic communication devices and is familiar with the ways in which drug traffickers conduct their business, including, but not limited to: their methods of importing and distributing drugs; their use of cellular telephones and digital display paging devices; and their use of numerical codes and code words to conduct their transactions.  Your Affiant has also reviewed and interpreted hundreds of conversations related to the distribution of heroin, cocaine, and other controlled substances.

## II.     BASIS OF INFORMATION

3.      I make this affidavit based upon personal knowledge derived from my participation this investigation and upon information I believe to be reliable from the following sources:

   a.   my experience investigating drug traffickers;

   b.   oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigations, local law enforcement, and other federal law enforcement agencies;

   c.   discussions I have had personally concerning this investigation with experienced narcotics investigators;

   d.   physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

   e.   public records;

f.  telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g.  statements of a confidential human source;

h.  consensually recorded phone calls;

i.  controlled purchases of narcotics;

j.  and court ordered precision location data ("pings") from telephone service providers.

4.  Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

5.  Because this affidavit is submitted for the limited purpose of securing criminal complaints, arrest warrants, and a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

## III.   PURPOSE OF AFFIDAVIT

### Individual for Whom a Criminal Complaint is Sought

6.  This affidavit is submitted for the purpose of showing probable cause in support of a criminal complaint alleging that between November 1, 2023 and or about February 10, 2026, in the Eastern District of Wisconsin, George BROOKS (DOB: XX/XX/1994) violated 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute controlled substances), 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances),

and 18 U.S.C. § 922(g)(1) (possession of firearm by a convicted felon) (hereinafter referred to as the **TARGET OFFENSES**).

## Property for Which Search Warrant is Sought

7. For the reasons discussed herein, there is also probable cause to believe that located at and in the following property, described in Attachment A (i.e., the "**TARGET PREMISES**") and below, are items that constitute evidence of the **TARGET OFFENSES**.

*3705 N 36th Street, Milwaukee, Wisconsin 53216* ("**TARGET PREMISES**")

The **TARGET PREMISES** are a two-story single-family residence with white siding, red window awnings, a dark gray roof, and an east entry front door. The numerals 3705 are displayed to the left and right of the west entry front door. The residence has a detached garage. Pictures of the **TARGET PREMISES** are below (See *Figures 1* and *2*):



(*Figure 1*)



(*Figure 2*)

Over the course of the investigation, case agents have observed George BROOKS access the rear door of the **TARGET PREMISES** and garage with keys and routinely remain inside the **TARGET PREMISES** overnight.  Additionally, case agents have observed BROOKS repeatedly return to the **TARGET PREMISES** throughout the day, parking his identified vehicles on the **TARGET PREMISES'** driveway.  Based on the foregoing observations, case agents believe the **TARGET PREMISES** is BROOKS's primary residence.  Location data derived from the cellular device assigned number (414) 408-5100, which case agents determined through the course of the investigation is used by BROOKS, indicates that this cellular device is consistently located at the **TARGET PREMISES** overnight. Prior to the controlled narcotics transaction on December 23, 2025 (detailed below), case agents observed BROOKS depart the **TARGET PREMISES** in a white 2006

Cadillac Escalade pickup truck, bearing Wisconsin license plates numbered BCJ3455.

## III.    TARGET SUBJECT

8.     Information about George BROOKS and his illicit activities comes from the following sources and criminal indices: observations made during physical and static electronic surveillance, analysis of phone tolls, the instillation of pen register/trap and trace devices, interviews conducted with a confidential human source and a source of information, information obtained from other law enforcement officers, controlled evidence purchases, warrants obtained authorizing location data for cellphones, and a traffic stop. George BROOKS – BROOKS is a mid-level marijuana, cocaine, and methamphetamine dealer, who sources his product from a variety of high-level narcotics traffickers operating in Milwaukee, Wisconsin. BROOKS routinely distributes these drugs as well as traffics firearms in the Eastern District of Wisconsin and he has used, among other cellular devices, a device assigned call number (414) 408-5100 (hereinafter Telephone 1) to plan, coordinate, and conduct his illicit transactions.

## IV.    SOURCES OF INFORMATION

9.     In 2023, case agents received information concerning George BROOKS's illegal drug trafficking and prohibited possession of weapons. Specifically, in July 2023, a Confidential Human Source (CHS1) told case agents that BROOKS was a dealer of marijuana and powder cocaine. CHS1 claimed to have observed approximately 4.5 ounces of cocaine powder, 100 grams of heroin, 8 pounds of marijuana, and two handguns in BROOKS's possession. In September 2023, a Source of Information (SOI-1) told case agents that BROOKS was a drug dealer in

possession of marijuana and ounces of powder cocaine. SOI-1 said that BROOKS also sold cocaine base and possessed at least one firearm.

10.     Your Affiant believes that CHS1 is credible. CHS1 has been extensively questioned by your Affiant, federal law enforcement officials, and local law enforcement officials within Wisconsin as to other individuals whom your Affiant is currently investigating and who are involved in drug trafficking and the prohibited possession of weapons.

11.     CHS1's information is consistent with your Affiant's knowledge of BROOKS and EVANS. Furthermore, a substantial portion of the CHS1's information has been corroborated through independent investigation, information and evidence through oral and written reports, court ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually recorded meetings and calls. CHS1 is a convicted felon with more than 4 felony convictions. CHS1 is cooperating with law enforcement for consideration for a pending federal case. For these reasons, your Affiant believes CHS1 to be reliable.

## V.     FACTS ESTABLISHING PROBABLE CAUSE

12.     In September 2023, case agents interviewed a Source of Information (SOI1) regarding George BROOKS. SOI1 stated that he/she knew an individual named "George Brooks," using the alias, "Greedy," who would purchase and sell powder cocaine, "crack" cocaine, and marijuana. SOI1 also indicated that BROOKS would trade in firearms. SOI1 said BROOKS would leave these controlled substances in his vehicle, depending on the condition of his relationship with the mother of his child.

13.     MASSTF subsequently opened an investigation into George BROOKS, who case agents have learned is a suspected member of the Gangster Disciples street gang.  During the course of the investigation, case agents have gained information and evidence through oral and written reports, courts ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually recorded meetings and calls.  Through these investigative techniques, case agents determined BROOKS was engaged in narcotics trafficking and unlawfully possessed firearms.  Specifically, MASSTF conducted several controlled narcotics purchases and a controlled firearm purchase from GEORGE BROOKS utilizing CHS1

**Controlled Purchase of Cocaine and Marijuana – November 1, 2023**

14.     On November 1, 2023, CHS1, under the direction of MASSTF, conducted a controlled purchase of approximately 27.2 grams of suspected powder cocaine and approximately a half pound of suspected marijuana from BROOKS in exchange for $2,000.00 in pre-recorded cash. Prior to the controlled purchase, case agents searched CHS1 for contraband with negative results and activated recording equipment provided to CHS1.  During a recorded call, BROOKS informed CHS1 that they would meet at "65th and Hampton."  At approximately 3:50 p.m., CHS1 arrived in the vicinity of 4800 N 65th Street, Milwaukee, Wisconsin.  At approximately 3:50 p.m., CHS1 received a call from BROOKS, who directed CHS1 to turn onto N. 65th Street immediately north of W Hampton Avenue.  CHS1 parked halfway up the block on N 65th Street.  Shortly thereafter, a white Mercedes sedan, bearing Wisconsin plates numbered AMX4745, arrived, followed by a white Jeep, bearing Wisconsin plates numbered MV4713C.  At approximately 3:52 p.m., BROOKS exited the Mercedes and entered the back seat of the white Jeep.

15.     A Honda Odyssey, bearing Wisconsin plates numbered AST5463, arrived, and case agents observed the Odyssey's driver conduct a hand-to-hand exchange, with cash visible, through the windows of the Odyssey and the white Jeep.  At approximately 3:56 p.m., case agents observed BROOKS exit the white Jeep and walk out of view of physical surveillance.  According to CHS1, BROOKS approached CHS1's vehicle where CHS1 gave BROOKS $2,000.00 in cash through the vehicle's open driver-side door.  CHS1 said BROOKS then entered the backseat of the white Jeep, and thereafter conducted a hand-to-hand transaction with the Odyssey's driver before returning to and entering CHS1's vehicle.  According to CHS1, BROOKS then gave him/her the suspected marijuana and the suspected powder cocaine.  After the controlled narcotics transaction, case agents retrieved the suspected contraband from CHS1.  The suspected marijuana was contained in two clear vacuum sealed bags and the suspected powder cocaine was contained in a knotted clear baggie, consistent with packaging of street-level narcotics.  The suspected powder cocaine was submitted to the North Central DEA Laboratory, which subsequently confirmed, within an estimate at the 95% level of confidence, that the substance was powder cocaine.

**Controlled Purchase of Firearm from BROOKS – April 22, 2024**

16.     On April 22, 2024, CHS1, under the direction of MASSTF, conducted a controlled purchase of a Taurus G2S handgun, bearing serial number #TMC09591, in exchange for $900.00. Prior to the controlled purchase, case agents searched CHS1 and his/her vehicle for contraband with negative results. At approximately 2:17 p.m., BROOKS called CHS1 to inform CHS1 where to initially meet BROOKS.  Shortly after meeting BROOKS at the agreed location, CHS1 advised case agents that BROOKS wanted to lead CHS1 to another location to conduct the firearms purchase.  At approximately 2:40 p.m., CHS1 called BROOKS and inquired about where they were going.  BROOKS replied, "We going on National nigga, to my momma's house.  I have to

go get her first… she got the key." Upon reviewing pen register trap and trace (PRTT) data from BROOKS's cellular device (i.e., at the time, a cellular device assigned call number (414) 242-2566), case agents noted an outgoing-answered call, at approximately 2:26 p.m., from BROOKS's cellular device to (262) 358-2370 (hereinafter Telephone 2), which was subscribed to Charmain D. Brooks, GEORGE BROOKS's mother, who is also known as Charmain D. EVANS.

17.     CHS1 followed BROOKS's vehicle to the gated parking lot located at 704 W National Avenue, Milwaukee, Wisconsin.  At this time, case agents were aware that EVANS's residential address was 704 W. National Avenue, Apt. 338, Milwaukee, Wisconsin 53204.  BROOKS and CHS1 waited in their respective vehicles at the gate to the apartment building's parking lot until the gate opened. Security camera footage shows a light gold Mercedes Benz sedan, followed by CHS1's vehicle, arrive at the apartment building's parking lot at approximately 2:46 p.m.  The light gold Mercedes Benz parked on the eastern side of the parking lot, immediately north of a dark-colored Volkswagen Jetta, bearing Wisconsin plates numbered ARP1365, and registered to Charmain Davina Rogers, another alias for EVANS.  Soon thereafter, BROOKS is seen exiting the Mercedes and entering the Volkswagen Jetta's front passenger side.  At approximately 2:47 p.m., security camera footage captured BROOKS approaching CHS1's front passenger door, opening the door, and standing in the threshold.  Shortly thereafter, BROOKS returned to the Jetta's driver-side window.  Security camera footage next captured CHS1 exiting his/her vehicle and entering the Jetta's front passenger side.  Case agents observed BROOKS standing by the Jetta's driver-side door.   At approximately 2:49 p.m., CHS1 is seen exiting the Jetta's front passenger side, returning to his/her vehicle, and then departing the area.

18.     After retrieving the Taurus firearm from CHS1, which was loaded with seven unfired cartridges, case agents debriefed CHS1 about the controlled firearm purchase.  CHS1 stated that

after driving to EVANS's residence, CHS1 waited for EVANS to open the gate to her apartment's parking lot. CHS1 identified EVANS from a photograph provided by case agents and said her name was Charmain Rogers. CHS1 stated that upon entering the black Volkswagen Jetta, EVANS was in the vehicle's driver's seat, and BROOKS approached the vehicle's driver's side, where he retrieved the Taurus firearm from EVANS before placing it in CHS1's vehicle. CHS1 paid EVANS $900.00 in cash for the Taurus firearm. According to CHS1, during the firearms transaction, BROOKS said he had 100 bullets available for the Taurus and EVANS said she had two AR-style rifles and two short Draco-style rifles for sale. Before April 22, 2024, BROOKS had been convicted in the state of Wisconsin of Attempting to Flee Or Elude An Officer, a class I felony, Wisconsin Statutes 346.04(3) (case no.: 2018CF003614); Armed Robbery with Use of Force [Modifiers: Party to a Crime], a class C felony, Wisconsin Statutes 943.32(2) (case no.: 2013CF000807); and Burglary-Building or Dwelling, a class F felony, Wisconsin Statutes 943.10(1m)(a) (case no.: 2012CF005893), which are each crimes punishable by imprisonment for a term exceeding one year. Furthermore, based on training and experience, your Affiant knows that Taurus firearms are manufactured outside the state of Wisconsin (i.e., in Brazil and the state of Georgia), and that the Taurus firearm obtained from BROOKS would have had to travel in interstate and/or foreign commerce before he possessed it.

### Traffic Stop – April 24, 2024

19.     On April 24, 2024, using an undercover officer, the Washington County Multi-Jurisdictional Drug Enforcement Group conducted a recorded controlled purchase of suspected fentanyl and cocaine base from Traevon L. Patterson in exchange for $500.00. The controlled narcotics purchase occurred within the parking lot of MGS Enterprises in Germantown, Washington County, Wisconsin. A 2007 silver Mercedes, bearing Wisconsin plates numbered

AXL2023, arrived at the agreed location for the controlled purchase. Shortly after the transaction, the Mercedes departed the area and was subsequently stopped by law enforcement. George BROOKS was operating the Mercedes while Patterson and another subject were in the vehicle's passenger seats. The confirmed buy money was located by law enforcement on Patterson and approximately 920.42 grams of a green leafy substance, which field-tested positive for marijuana, was located in a black duffel bag contained within two large vacuum sealed bags in the back seat of the vehicle.

## Controlled Purchase of Methamphetamine – December 23, 2025

20. On December 23, 2025, CHS1, under the direction of MASSTF, conducted a controlled purchase of methamphetamine from BROOKS. Prior to the controlled purchase, case agents searched CHS1 and his/her vehicle for contraband with negative results. At approximately 11:28 a.m., CHS1 called BROOKS, who was using Telephone 1. During the call, BROOKS directed CHS1 to meet at N. 65th Street and W Hampton Avenue to conduct the methamphetamine transaction. CHS1 indicated that BROOKS would charge $3000.00 for a pound of methamphetamine. Case agents provided CHS1 with a recording device to capture his/her meeting with BROOKS.

21. At approximately 12:03 p.m., case agents observed BROOKS park a white Cadillac Escalade pickup truck, bearing Wisconsin plates numbered BCJ3455, in the 4800 block of N 65th Street, Milwaukee, Wisconsin. (See *Figures 3* and *4*) Prior to the methamphetamine transaction, case agents observed a Buick Encore, bearing South Carolina plates numbered 217APP, parked at the same location. At approximately 12:06 p.m., BROOKS entered the Buick Encore. At approximately 12:10 p.m., BROOKS exited the Buick Encore while holding a food container.

BROOKS then entered CHS1's vehicle with the food container. CHS1 provided BROOKS the $3,000.00 in pre-recorded cash provided by the FBI. At approximately 12:11 p.m., case agents observed BROOKS exit CHS1's vehicle without the food container and re-enter the Buick Encore. At approximately 12:13 p.m., case agents observed BROOKS exit the Buick Encore and approach the driver-side door of CHS1's vehicle. CHS1 said that BROOKS carried a box containing the suspected methamphetamine over to CHS1's window and passed it to CHS1 through the vehicle's open window. Case agents then observed the Buick Encore depart southbound on N 65th Street towards W. Hampton Avenue. After the controlled purchase, MASSTF took custody of the suspected methamphetamine, contained in a clear Ziploc bag, which is consistent with street-level narcotics trafficking. Case agents' search of CHS1 and his/her vehicle following the controlled buy otherwise yielded negative results. The suspected methamphetamine, which appeared to be an off-white crystal-like substance, was tested with a TruNarc Analyzer, which indicated the substance was positive for methamphetamine.



(*Figure 3*)



(*Figure 4*)

**The TARGET PREMISES, BROOKS's Vehicles, and a Suspected Drug Transaction**

22.     Case agents have observed BROOKS routinely use the white Cadillac Escalade pickup, bearing Wisconsin plates numbered BCJ3455, and routinely park the vehicle on the rear slab next to the unattached garage of the **TARGET PREMISES**. On February 7, 2026, at approximately 9:54 a.m., case agents observed a white 2023 Tesla sedan, bearing Wisconsin plates numbered BCF9465, and registered to Saidah Easton (DOB: XX/XX/1997, address: 2708 E. Newberry Street, Appleton, Wisconsin) (See *Figure 5*) park on the rear parking slab of the **TARGET PREMISES**, followed by the Cadillac Escalade pickup truck. BROOKS exited the Escalade and a female, believed to be Sharita MOSES (DOB: XX/XX/1982), exited the Tesla's driver's compartment. BROOKS and MOSES retrieved what appeared to be groceries and brought them inside the rear of the **TARGET PREMISES**. Since February 7, 2026, case agents have observed BROOKS primarily using the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and parking it on the same rear parking slab associated with the **TARGET PREMISES**.



(*Figure 5*)

23.  On February 10, 2026, at approximately 5:34 a.m., case agents observed a subject matching BROOKS's description exit the **TARGET PREMISES**, enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and depart the location at approximately 5:40 a.m.  At approximately 6:48 a.m., case agents observed the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, park on the parking slab for the **TARGET PREMISES** and BROOKS exit the vehicle.  Case agents then observed BROOKS enter the rear entrance of the **TARGET PREMISES** using keys to access the residence.

24.  On February 10, 2026, at approximately 12:37 p.m., case agents observed BROOKS exit the **TARGET PREMISES** and enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, that was parked on the parking slab for the **TARGET PREMISES**.  At approximately 12:39 p.m., case agents observed an unknown black male (UM), who was wearing a puffer jacket and dark winter beanie, approach the front driver-side window of the white Tesla sedan occupied by BROOKS.  Case agents observed the UM extend his empty left hand into the Tesla's half-

opened driver-side front window and receive a small baggie containing a green substance, which case agents believed to be marijuana. Case agents observed that the UM held the baggie to his nose and sniff its contents while communicating with BROOKS. At approximately 12:41 p.m., case agents observed that UM had concluded his interaction with BROOKS and departed the location. Case agents then observed BROOKS exit the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and enter the **TARGET PREMISES**'s unattached garage, using keys to access the garage door. Based on training and experience, your Affiant believes BROOKS had conducted a hand-to-hand marijuana transaction with the UM, particularly given the short duration of their interaction, the transfer of what appeared to be a controlled substance, and BROOKS's history of possessing and trafficking controlled substances, including marijuana.

## VI.    ITEMS TO BE SEIZED

25.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **TARGET PREMISES.**

26.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Drug dealers often keep significant sums of United States currency on hand in order to maintain and finance their ongoing distribution activities. Drug dealers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for drug dealers to possess drug proceeds and items purchased with such proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of drug dealers.

b.      Drug dealers and persons involved in the manufacturing, distribution, and possession with intent to distribute controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their persons, drugs, or the proceeds of drug transactions. Drug dealers commonly maintain such firearms and weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles. In addition, other firearm-related items, such as gun pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging, targets, expended pieces of lead, photographs of firearms, and paperwork showing the purchase, storage, disposition, or dominion and control over firearms, ammunition, and related items are commonly possessed by drug dealers along with their firearms.

c.      Drug dealers often maintain paraphernalia for manufacturing and distributing controlled substances, including packaging materials, scales, and cutting agents.  Drug dealers commonly maintain such paraphernalia at stash houses, in their homes, or in their vehicles.

d.      Drug dealers often maintain paper records of their drug trafficking activities, including ledgers; handwritten addresses or telephone numbers in books or papers reflecting names, addresses and/or telephone numbers of criminal associates; paperwork relating to various properties, including storage facilities, where contraband or illicit proceeds may be kept, etc.  Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **TARGET PREMISES**.

e.      Drug dealers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug dealers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug dealers commonly use other capabilities of computers and electronic devices to further their drug distribution

activities. Therefore, evidence related to drug-distribution activity is likely to be found on electronic storage media found at the **TARGET PREMISES** as further described below.

27.     In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **TARGET PREMISES**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## VII.   DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

28.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.     *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **TARGET PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons;

        a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when

files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because of special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".

30. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe

that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because.

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what task and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of

anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media exculpating the computer owner. Further, computer and storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping"

program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the

criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

31.     *Necessity of seizing or copying entire computers or storage media*.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure of imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  *Technical requirements*.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

32.  *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

33.  The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following: I know from my training and experience, as well as from information found in

publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

34.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

35.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

36.     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises.  For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

37.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

38.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

39.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period

of time. Biometic features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

40.     Due to the foregoing, with respect to any person who is located in the **TARGET PREMISES** during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

41.     Because several people share the **TARGET PREMISES** as a residence, it is possible that the **TARGET PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

42.     Based on the foregoing, I believe there is probable cause to believe that George BROOKS has committed violations of federal law, including the **TARGET OFFENSES**. I further believe that there is probable cause to believe that located at and in the **TARGET PREMISES** described in Attachment A, there is evidence of the **TARGET OFFENSES**. Case agents believe there are currently documents and records showing dominion and control of the **TARGET PREMISES**

and vehicles, cellular telephones, electronic devices, and other computers, and other evidence reflecting the targets' involvement in the offenses described above, located within the premises, vehicles, and persons described in Attachment A. For all of the foregoing reasons, I requested authorization to search the premises and vehicles more fully described in Attachment A for the things described in Attachment B.

**ATTACHMENT A**

*LOCATION TO BE SEARCHED*

3705 N 36th Street, Milwaukee, Wisconsin 53216 (the "**TARGET PREMISES**") a two-story single-family residence with white siding, red window awnings, a dark gray roof, an east entry front door. The numerals "3705" are displayed to the left and right of the west entry front door. The residence has a detached garage. (See *Figures 1* and *2*) This warrant authorizes the search of the residence, the garage, and two vehicles, specifically described as a white 2006 Cadillac Escalade pickup truck, bearing Wisconsin license plates numbered BCJ3455 (See *Figures 3* and *4*), and a white 2023 Tesla sedan, bearing Wisconsin plates numbered BCF9465 (See *Figure 5*), at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



(*Figure 1*)



(*Figure 2*)



(*Figure 3*)



(*Figure 4*)



(*Figure 5*)

# ATTACHMENT B

## *ITEMS TO BE SEIZED*

1.    The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute controlled substances), and Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances); and Title 18, United States Code, Section 922(g)(1) (possession of a firearm by a convicted felon) (hereinafter, collectively referred to as the **TARGET OFFENSES**) from November 1, 2023, to the date of this warrant, namely:

   a.    Controlled substances and/or paraphernalia;

   b.    Packaging for controlled substances;

   c.    Drug ledgers and/or documentation;

   d.    Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

   e.    Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms, including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes, and any and all documentation related to the purchase of such items;

   f.    Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

   g.    Duffel, canvas bags, suitcase, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

   h.    Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated

from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

    i.   Photographs, videotapes, or other depictions of assets, firearms, co-conspirators, or controlled substances; and,

    j.   Records and information relating to the identity or location of George BROOKS.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and the forensic copies thereof.

3.    Any digital device which is itself or which contains evidence contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and forensic copies thereof.

4.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

    b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.   evidence of the attachment of other devices;

    d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    e.   evidence of the times the device was used;

    f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

    g.   records of or information about Internet Protocol addresses used by the device.

5.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs,

applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

6. As used herein, the term digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

7. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be search at that location. The search team shall complete the search as soon as practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

    b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any

data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

k. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

l. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as practicable, return the device and delete or destroy all forensic copies thereof.

m. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data and may access such data at any time.

n. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

o. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

p. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    i. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    ii. During the execution of this search warrant, law enforcement is permitted to: (1) depress George BROOKS's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of George BROOKS's face with his eyes open to activate the facial-, iris, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    iii. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

    iv. These warrants are being executed by the Milwaukee Area Safe Streets Task Force, which is comprised of both state, local, and federal law enforcement.

**FFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT and SEARCH WARRANT**

I, James Buck, being first duly sworn, hereby depose and state as follows:

# I.      INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant is a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  Your Affiant has been a Special Agent with the FBI since June 2023 and is assigned to the FBI's Milwaukee Area Safe Streets Task Force (MASSTF), a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including narcotics trafficking and conspiracy to possess narcotics with intent to distribute, as defined under Title 21 of the United States Code.   Your Affiant has been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. Your Affiant has participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects.  As a result of this training and investigative experience, your Affiant has learned how and why narcotics traffickers typically conduct various aspects of their criminal activities.   Your Affiant has experience in the investigation of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.  Through your Affiant's training, education, and experience, your Affiant became familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.  In addition, your Affiant has conducted follow-up investigations concerning the concealment of assets, money, and bank records, and the identification of co-conspirators through

the use of ledgers, telephone bills and records, photographs, and bank checks, all as related to drug trafficking.

2.     Your Affiant has participated in investigations involving the interception of communications made via wire and electronic communication devices and is familiar with the ways in which drug traffickers conduct their business, including, but not limited to: their methods of importing and distributing drugs; their use of cellular telephones and digital display paging devices; and their use of numerical codes and code words to conduct their transactions.  Your Affiant has also reviewed and interpreted hundreds of conversations related to the distribution of heroin, cocaine, and other controlled substances.

## II.     BASIS OF INFORMATION

3.     I make this affidavit based upon personal knowledge derived from my participation this investigation and upon information I believe to be reliable from the following sources:

   a.   my experience investigating drug traffickers;

   b.   oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigations, local law enforcement, and other federal law enforcement agencies;

   c.   discussions I have had personally concerning this investigation with experienced narcotics investigators;

   d.   physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

   e.   public records;

f.   telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g.   statements of a confidential human source;

h.   consensually recorded phone calls;

i.   controlled purchases of narcotics;

j.   and court ordered precision location data ("pings") from telephone service providers.

4.   Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

5.   Because this affidavit is submitted for the limited purpose of securing a criminal complaint, arrest warrant, and a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

## III.   PURPOSE OF AFFIDAVIT

### Individual for Whom a Criminal Complaint is Sought

6.   This affidavit is submitted for the purpose of showing probable cause in support of a criminal complaint alleging that between November 1, 2023 and or about February 10, 2026, in the Eastern District of Wisconsin, George BROOKS (DOB: XX/XX/1994) violated 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute controlled substances), 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances),

and 18 U.S.C. § 922(g)(1) (possession of firearm by a convicted felon) (hereinafter referred to as the **TARGET OFFENSES**).

## Property for Which Search Warrant is Sought

7. For the reasons discussed herein, there is also probable cause to believe that located at and in the following property, described in Attachment A (i.e., the "**TARGET PREMISES**") and below, are items that constitute evidence of the **TARGET OFFENSES**.

*3705 N 36th Street, Milwaukee, Wisconsin 53216* ("**TARGET PREMISES**")

The **TARGET PREMISES** are a two-story single-family residence with white siding, red window awnings, a dark gray roof, and an east entry front door. The numerals 3705 are displayed to the left and right of the west entry front door. The residence has a detached garage. Pictures of the **TARGET PREMISES** are below (See *Figures 1* and *2*):



(*Figure 1*)



(*Figure 2*)

Over the course of the investigation, case agents have observed George BROOKS access the rear door of the **TARGET PREMISES** and garage with keys and routinely remain inside the **TARGET PREMISES** overnight. Additionally, case agents have observed BROOKS repeatedly return to the **TARGET PREMISES** throughout the day, parking his identified vehicles on the **TARGET PREMISES'** driveway. Based on the foregoing observations, case agents believe the **TARGET PREMISES** is BROOKS's primary residence. Location data derived from the cellular device assigned number (414) 408-5100, which case agents determined through the course of the investigation is used by BROOKS, indicates that this cellular device is consistently located at the **TARGET PREMISES** overnight. Prior to the controlled narcotics transaction on December 23, 2025 (detailed below), case agents observed BROOKS depart the **TARGET PREMISES** in a white 2006

Cadillac Escalade pickup truck, bearing Wisconsin license plates numbered BCJ3455.

## III.    TARGET SUBJECT

8.    Information about George BROOKS and his illicit activities comes from the following sources and criminal indices: observations made during physical and static electronic surveillance, analysis of phone tolls, the instillation of pen register/trap and trace devices, interviews conducted with a confidential human source and a source of information, information obtained from other law enforcement officers, controlled evidence purchases, warrants obtained authorizing location data for cellphones, and a traffic stop.  George BROOKS – BROOKS is a mid-level marijuana, cocaine, and methamphetamine dealer, who sources his product from a variety of high-level narcotics traffickers operating in Milwaukee, Wisconsin. BROOKS routinely distributes these drugs as well as traffics firearms in the Eastern District of Wisconsin and he has used, among other cellular devices, a device assigned call number (414) 408-5100 (hereinafter Telephone 1) to plan, coordinate, and conduct his illicit transactions.

## IV.    SOURCES OF INFORMATION

9.    In 2023, case agents received information concerning George BROOKS's illegal drug trafficking and prohibited possession of weapons.  Specifically, in July 2023, a Confidential Human Source (CHS1) told case agents that BROOKS was a dealer of marijuana and powder cocaine. CHS1 claimed to have observed approximately 4.5 ounces of cocaine powder, 100 grams of heroin, 8 pounds of marijuana, and two handguns in BROOKS's possession.  In September 2023, a Source of Information (SOI-1) told case agents that BROOKS was a drug dealer in

possession of marijuana and ounces of powder cocaine. SOI-1 said that BROOKS also sold cocaine base and possessed at least one firearm.

10. Your Affiant believes that CHS1 is credible. CHS1 has been extensively questioned by your Affiant, federal law enforcement officials, and local law enforcement officials within Wisconsin as to other individuals whom your Affiant is currently investigating and who are involved in drug trafficking and the prohibited possession of weapons.

11. CHS1's information is consistent with your Affiant's knowledge of BROOKS and EVANS. Furthermore, a substantial portion of the CHS1's information has been corroborated through independent investigation, information and evidence through oral and written reports, court ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually recorded meetings and calls. CHS1 is a convicted felon with more than 4 felony convictions. CHS1 is cooperating with law enforcement for consideration for a pending federal case. For these reasons, your Affiant believes CHS1 to be reliable.

## V.     FACTS ESTABLISHING PROBABLE CAUSE

12. In September 2023, case agents interviewed a Source of Information (SOI1) regarding George BROOKS. SOI1 stated that he/she knew an individual named "George Brooks," using the alias, "Greedy," who would purchase and sell powder cocaine, "crack" cocaine, and marijuana. SOI1 also indicated that BROOKS would trade in firearms. SOI1 said BROOKS would leave these controlled substances in his vehicle, depending on the condition of his relationship with the mother of his child.

13.    MASSTF subsequently opened an investigation into George BROOKS, who case agents have learned is a suspected member of the Gangster Disciples street gang.  During the course of the investigation, case agents have gained information and evidence through oral and written reports, courts ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually recorded meetings and calls.  Through these investigative techniques, case agents determined BROOKS was engaged in narcotics trafficking and unlawfully possessed firearms.  Specifically, MASSTF conducted several controlled narcotics purchases and a controlled firearm purchase from GEORGE BROOKS utilizing CHS1

**Controlled Purchase of Cocaine and Marijuana – November 1, 2023**

14.    On November 1, 2023, CHS1, under the direction of MASSTF, conducted a controlled purchase of approximately 27.2 grams of suspected powder cocaine and approximately a half pound of suspected marijuana from BROOKS in exchange for $2,000.00 in pre-recorded cash. Prior to the controlled purchase, case agents searched CHS1 for contraband with negative results and activated recording equipment provided to CHS1.  During a recorded call, BROOKS informed CHS1 that they would meet at "65th and Hampton."  At approximately 3:50 p.m., CHS1 arrived in the vicinity of 4800 N 65th Street, Milwaukee, Wisconsin.  At approximately 3:50 p.m., CHS1 received a call from BROOKS, who directed CHS1 to turn onto N. 65th Street immediately north of W Hampton Avenue.  CHS1 parked halfway up the block on N 65th Street.  Shortly thereafter, a white Mercedes sedan, bearing Wisconsin plates numbered AMX4745, arrived, followed by a white Jeep, bearing Wisconsin plates numbered MV4713C.  At approximately 3:52 p.m., BROOKS exited the Mercedes and entered the back seat of the white Jeep.

15.     A Honda Odyssey, bearing Wisconsin plates numbered AST5463, arrived, and case agents observed the Odyssey's driver conduct a hand-to-hand exchange, with cash visible, through the windows of the Odyssey and the white Jeep.  At approximately 3:56 p.m., case agents observed BROOKS exit the white Jeep and walk out of view of physical surveillance.  According to CHS1, BROOKS approached CHS1's vehicle where CHS1 gave BROOKS $2,000.00 in cash through the vehicle's open driver-side door.  CHS1 said BROOKS then entered the backseat of the white Jeep, and thereafter conducted a hand-to-hand transaction with the Odyssey's driver before returning to and entering CHS1's vehicle.  According to CHS1, BROOKS then gave him/her the suspected marijuana and the suspected powder cocaine.  After the controlled narcotics transaction, case agents retrieved the suspected contraband from CHS1.  The suspected marijuana was contained in two clear vacuum sealed bags and the suspected powder cocaine was contained in a knotted clear baggie, consistent with packaging of street-level narcotics.  The suspected powder cocaine was submitted to the North Central DEA Laboratory, which subsequently confirmed, within an estimate at the 95% level of confidence, that the substance was powder cocaine.

**Controlled Purchase of Firearm from BROOKS – April 22, 2024**

16.     On April 22, 2024, CHS1, under the direction of MASSTF, conducted a controlled purchase of a Taurus G2S handgun, bearing serial number #TMC09591, in exchange for $900.00. Prior to the controlled purchase, case agents searched CHS1 and his/her vehicle for contraband with negative results. At approximately 2:17 p.m., BROOKS called CHS1 to inform CHS1 where to initially meet BROOKS.  Shortly after meeting BROOKS at the agreed location, CHS1 advised case agents that BROOKS wanted to lead CHS1 to another location to conduct the firearms purchase.  At approximately 2:40 p.m., CHS1 called BROOKS and inquired about where they were going.  BROOKS replied, "We going on National nigga, to my momma's house.  I have to

go get her first… she got the key." Upon reviewing pen register trap and trace (PRTT) data from BROOKS's cellular device (i.e., at the time, a cellular device assigned call number (414) 242-2566), case agents noted an outgoing-answered call, at approximately 2:26 p.m., from BROOKS's cellular device to (262) 358-2370 (hereinafter Telephone 2), which was subscribed to Charmain D. Brooks, GEORGE BROOKS's mother, who is also known as Charmain D. EVANS.

17.     CHS1 followed BROOKS's vehicle to the gated parking lot located at 704 W National Avenue, Milwaukee, Wisconsin.  At this time, case agents were aware that EVANS's residential address was 704 W. National Avenue, Apt. 338, Milwaukee, Wisconsin 53204.  BROOKS and CHS1 waited in their respective vehicles at the gate to the apartment building's parking lot until the gate opened. Security camera footage shows a light gold Mercedes Benz sedan, followed by CHS1's vehicle, arrive at the apartment building's parking lot at approximately 2:46 p.m.  The light gold Mercedes Benz parked on the eastern side of the parking lot, immediately north of a dark-colored Volkswagen Jetta, bearing Wisconsin plates numbered ARP1365, and registered to Charmain Davina Rogers, another alias for EVANS.  Soon thereafter, BROOKS is seen exiting the Mercedes and entering the Volkswagen Jetta's front passenger side.  At approximately 2:47 p.m., security camera footage captured BROOKS approaching CHS1's front passenger door, opening the door, and standing in the threshold.  Shortly thereafter, BROOKS returned to the Jetta's driver-side window.  Security camera footage next captured CHS1 exiting his/her vehicle and entering the Jetta's front passenger side.  Case agents observed BROOKS standing by the Jetta's driver-side door.   At approximately 2:49 p.m., CHS1 is seen exiting the Jetta's front passenger side, returning to his/her vehicle, and then departing the area.

18.     After retrieving the Taurus firearm from CHS1, which was loaded with seven unfired cartridges, case agents debriefed CHS1 about the controlled firearm purchase.  CHS1 stated that

after driving to EVANS's residence, CHS1 waited for EVANS to open the gate to her apartment's parking lot. CHS1 identified EVANS from a photograph provided by case agents and said her name was Charmain Rogers. CHS1 stated that upon entering the black Volkswagen Jetta, EVANS was in the vehicle's driver's seat, and BROOKS approached the vehicle's driver's side, where he retrieved the Taurus firearm from EVANS before placing it in CHS1's vehicle. CHS1 paid EVANS $900.00 in cash for the Taurus firearm. According to CHS1, during the firearms transaction, BROOKS said he had 100 bullets available for the Taurus and EVANS said she had two AR-style rifles and two short Draco-style rifles for sale. Before April 22, 2024, BROOKS had been convicted in the state of Wisconsin of Attempting to Flee Or Elude An Officer, a class I felony, Wisconsin Statutes 346.04(3) (case no.: 2018CF003614); Armed Robbery with Use of Force [Modifiers: Party to a Crime], a class C felony, Wisconsin Statutes 943.32(2) (case no.: 2013CF000807); and Burglary-Building or Dwelling, a class F felony, Wisconsin Statutes 943.10(1m)(a) (case no.: 2012CF005893), which are each crimes punishable by imprisonment for a term exceeding one year. Furthermore, based on training and experience, your Affiant knows that Taurus firearms are manufactured outside the state of Wisconsin (i.e., in Brazil and the state of Georgia), and that the Taurus firearm obtained from BROOKS would have had to travel in interstate and/or foreign commerce before he possessed it.

### Traffic Stop – April 24, 2024

19. On April 24, 2024, using an undercover officer, the Washington County Multi-Jurisdictional Drug Enforcement Group conducted a recorded controlled purchase of suspected fentanyl and cocaine base from Traevon L. Patterson in exchange for $500.00. The controlled narcotics purchase occurred within the parking lot of MGS Enterprises in Germantown, Washington County, Wisconsin. A 2007 silver Mercedes, bearing Wisconsin plates numbered

AXL2023, arrived at the agreed location for the controlled purchase. Shortly after the transaction, the Mercedes departed the area and was subsequently stopped by law enforcement. George BROOKS was operating the Mercedes while Patterson and another subject were in the vehicle's passenger seats. The confirmed buy money was located by law enforcement on Patterson and approximately 920.42 grams of a green leafy substance, which field-tested positive for marijuana, was located in a black duffel bag contained within two large vacuum sealed bags in the back seat of the vehicle.

### Controlled Purchase of Methamphetamine – December 23, 2025

20.     On December 23, 2025, CHS1, under the direction of MASSTF, conducted a controlled purchase of methamphetamine from BROOKS. Prior to the controlled purchase, case agents searched CHS1 and his/her vehicle for contraband with negative results. At approximately 11:28 a.m., CHS1 called BROOKS, who was using Telephone 1. During the call, BROOKS directed CHS1 to meet at N. 65th Street and W Hampton Avenue to conduct the methamphetamine transaction. CHS1 indicated that BROOKSwould charge $3000.00 for a pound of methamphetamine. Case agents provided CHS1 with a recording device to capture his/her meeting with BROOKS.

21.     At approximately 12:03 p.m., case agents observed BROOKS park a white Cadillac Escalade pickup truck, bearing Wisconsin plates numbered BCJ3455, in the 4800 block of N 65th Street, Milwaukee, Wisconsin. (See *Figures 3* and *4*)  Prior to the methamphetamine transaction, case agents observed a Buick Encore, bearing South Carolina plates numbered 217APP, parked at the same location. At approximately 12:06 p.m., BROOKS entered the Buick Encore. At approximately 12:10 p.m., BROOKS exited the Buick Encore while holding a food container.

BROOKS then entered CHS1's vehicle with the food container. CHS1 provided BROOKS the $3,000.00 in pre-recorded cash provided by the FBI. At approximately 12:11 p.m., case agents observed BROOKS exit CHS1's vehicle without the food container and re-enter the Buick Encore. At approximately 12:13 p.m., case agents observed BROOKS exit the Buick Encore and approach the driver-side door of CHS1's vehicle. CHS1 said that BROOKS carried a box containing the suspected methamphetamine over to CHS1's window and passed it to CHS1 through the vehicle's open window. Case agents then observed the Buick Encore depart southbound on N 65th Street towards W. Hampton Avenue. After the controlled purchase, MASSTF took custody of the suspected methamphetamine, contained in a clear Ziploc bag, which is consistent with street-level narcotics trafficking. Case agents' search of CHS1 and his/her vehicle following the controlled buy otherwise yielded negative results. The suspected methamphetamine, which appeared to be an off-white crystal-like substance, was tested with a TruNarc Analyzer, which indicated the substance was positive for methamphetamine.



(*Figure 3*)



(*Figure 4*)

**The TARGET PREMISES, BROOKS's Vehicles, and a Suspected Drug Transaction**

22.     Case agents have observed BROOKS routinely use the white Cadillac Escalade pickup, bearing Wisconsin plates numbered BCJ3455, and routinely park the vehicle on the rear slab next to the unattached garage of the **TARGET PREMISES**.  On February 7, 2026, at approximately 9:54 a.m., case agents observed a white 2023 Tesla sedan, bearing Wisconsin plates numbered BCF9465, and registered to Saidah Easton (DOB: XX/XX/1997, address: 2708 E. Newberry Street, Appleton, Wisconsin) (See *Figure 5*) park on the rear parking slab of the **TARGET PREMISES**, followed by the Cadillac Escalade pickup truck.  BROOKS exited the Escalade and a female, believed to be Sharita MOSES (DOB: XX/XX/1982), exited the Tesla's driver's compartment. BROOKS and MOSES retrieved what appeared to be groceries and brought them inside the rear of the **TARGET PREMISES**.  Since February 7, 2026, case agents have observed BROOKS primarily using the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and parking it on the same rear parking slab associated with the **TARGET PREMISES**.



(*Figure 5*)

23.     On February 10, 2026, at approximately 5:34 a.m., case agents observed a subject matching BROOKS's description exit the **TARGET PREMISES**, enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and depart the location at approximately 5:40 a.m.  At approximately 6:48 a.m., case agents observed the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, park on the parking slab for the **TARGET PREMISES** and BROOKS exit the vehicle.  Case agents then observed BROOKS enter the rear entrance of the **TARGET PREMISES** using keys to access the residence.

24.     On February 10, 2026, at approximately 12:37 p.m., case agents observed BROOKS exit the **TARGET PREMISES** and enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, that was parked on the parking slab for the **TARGET PREMISES**.  At approximately 12:39 p.m., case agents observed an unknown black male (UM), who was wearing a puffer jacket and dark winter beanie, approach the front driver-side window of the white Tesla sedan occupied by BROOKS.  Case agents observed the UM extend his empty left hand into the Tesla's half-

opened driver-side front window and receive a small baggie containing a green substance, which case agents believed to be marijuana. Case agents observed that the UM held the baggie to his nose and sniff its contents while communicating with BROOKS. At approximately 12:41 p.m., case agents observed that UM had concluded his interaction with BROOKS and departed the location. Case agents then observed BROOKS exit the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and enter the **TARGET PREMISES**'s unattached garage, using keys to access the garage door. Based on training and experience, your Affiant believes BROOKS had conducted a hand-to-hand marijuana transaction with the UM, particularly given the short duration of their interaction, the transfer of what appeared to be a controlled substance, and BROOKS's history of possessing and trafficking controlled substances, including marijuana.

## VI.    ITEMS TO BE SEIZED

25.    Based upon the facts contained in this Affidavit, your Affiant submits there is also probable cause to believe that the items listed in Attachment B will be found at the **TARGET PREMISES.**

26.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Drug dealers often keep significant sums of United States currency on hand in order to maintain and finance their ongoing distribution activities. Drug dealers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for drug dealers to possess drug proceeds and items purchased with such proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of drug dealers.

b.     Drug dealers and persons involved in the manufacturing, distribution, and possession with intent to distribute controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their persons, drugs, or the proceeds of drug transactions. Drug dealers commonly maintain such firearms and weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles. In addition, other firearm-related items, such as gun pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging, targets, expended pieces of lead, photographs of firearms, and paperwork showing the purchase, storage, disposition, or dominion and control over firearms, ammunition, and related items are commonly possessed by drug dealers along with their firearms.

c.     Drug dealers often maintain paraphernalia for manufacturing and distributing controlled substances, including packaging materials, scales, and cutting agents. Drug dealers commonly maintain such paraphernalia at stash houses, in their homes, or in their vehicles.

d.     Drug dealers often maintain paper records of their drug trafficking activities, including ledgers; handwritten addresses or telephone numbers in books or papers reflecting names, addresses and/or telephone numbers of criminal associates; paperwork relating to various properties, including storage facilities, where contraband or illicit proceeds may be kept, etc. Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **TARGET PREMISES**.

e.     Drug dealers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug dealers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug dealers commonly use other capabilities of computers and electronic devices to further their drug distribution

activities. Therefore, evidence related to drug-distribution activity is likely to be found on electronic storage media found at the **TARGET PREMISES** as further described below.

27. In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **TARGET PREMISES**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## VII.   DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

28. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **TARGET PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when

files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because of special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".

30. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe

that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what task and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of

anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media exculpating the computer owner. Further, computer and storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping"

program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the

criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

31.    *Necessity of seizing or copying entire computers or storage media*.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure of imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.   *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

32. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

33. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s),

making the use of biometric features necessary to the execution of the search authorized by this warrant.

34.     Because several people share the **TARGET PREMISES** as a residence, it is possible that the **TARGET PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

35.     Based on the foregoing, your Affiant submits there is probable cause to believe that George BROOKS, in the Eastern District of Wisconsin, conspired with others, known and unknown, to possess with intent to distribute and to distribute controlled substances, namely cocaine, marijuana, and methamphetamine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C); possession with intent to distribute and distribution of controlled substances, namely cocaine, marijuana, and methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); and felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).  Furthermore, there is probable cause to believe that located within the **TARGET PREMISES** is evidence pertaining to the fruits, instrumentalities, and proceeds of the possession with intent to distribute and distribution of controlled substances, and the conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846; and the possession of a firearm by a felon, in violation of  Title 18, United States Code, Section 922(g)(1) (i.e., the

**TARGET OFFENSES**), all of which are detailed more specifically in Attachment B, Items to be Seized.

## ATTACHMENT A

### *LOCATION TO BE SEARCHED*

3705 N 36th Street, Milwaukee, Wisconsin 53216 (the "**TARGET PREMISES**") a two-story single-family residence with white siding, red window awnings, a dark gray roof, an east entry front door.  The numerals "3705" are displayed to the left and right of the west entry front door. The residence has a detached garage. (See *Figures 1* and *2*)  This warrant authorizes the search of the residence, the garage, and two vehicles, specifically described as a white 2006 Cadillac Escalade pickup truck, bearing Wisconsin license plates numbered BCJ3455 (See *Figures 3* and *4*), and a white 2023 Tesla sedan, bearing Wisconsin plates numbered BCF9465 (See *Figure 5*), at this address.



(*Figure 1*)



(*Figure 2*)



(*Figure 3*)



(*Figure 4*)



(*Figure 5*)

1.  The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute controlled substances), and Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances); and Title 18, United States Code, Section 922(g)(1) (possession of a firearm by a convicted felon) (hereinafter, collectively referred to as the **TARGET OFFENSES**) from November 1, 2023, to the date of this warrant, namely:

    a.  Controlled substances and/or paraphernalia;

    b.  Packaging for controlled substances;

    c.  Drug ledgers and/or documentation;

    d.  Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

    e.  Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms, including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes, and any and all documentation related to the purchase of such items;

    f.  Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

    g.  Duffel, canvas bags, suitcase, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

    h.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated

from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

    i.  Photographs, videotapes, or other depictions of assets, firearms, co-conspirators, or controlled substances; and,

    j.  Records and information relating to the identity or location of George BROOKS.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and the forensic copies thereof.

3.    Any digital device which is itself or which contains evidence contraband, fruits, records, or instrumentalities of the **TARGET OFFENSES**, and forensic copies thereof.

4.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    a.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

    b.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment of other devices;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    e.  evidence of the times the device was used;

    f.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

    g.  records of or information about Internet Protocol addresses used by the device.

5.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs,

applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

6.    As used herein, the term digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

7.    This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.